IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : CRIMINAL ACTION
:
v. :
:
JOHN EDWARD DONO : NO. 10-763

MEMORANDUM

McLaughlin, J.                                                            March 17, 2011

       The defendant is charged with one count of being a felon in possession of a firearm and one count of possessing a firearm with an altered/obliterated serial number. The defendant has moved to suppress evidence that was seized pursuant to a parole search of his home and statements made while in custody thereafter. The Court held an evidentiary hearing on January 26, 2011, after which it received further briefing on the motion. The Court will grant the defendant's motion.

       In this case, a police detective received reliable information that the defendant was in possession of a firearm. The detective contacted the defendant's parole agent, but only informed the parole agent that he had received an anonymous tip. Without additional investigation, the parole officer then conducted a warrantless search of the defendant's home and recovered a weapon. In its initial brief in opposition to the motion, the government believed that the parole agent was aware of the reliable information possessed by the detective. See

Opp'n at 2.[1]  At the evidentiary hearing, the government conceded that reasonable suspicion must be measured by what the parole agent knew at the time of the search.  After the evidentiary hearing, the government requested the opportunity to submit additional briefing to address whether the detective's knowledge may be imputed to the parole agent under the collective knowledge doctrine.  The Court allowed the government to do so, and the defendant submitted a reply brief.

I.   Findings of Fact

On February 4, 2010, Detective Jason Harris of the Newtown Township Police Department spoke on the phone with Johnnille Dono, the adult daughter of the defendant John Edward Dono.  Ms. Dono told Detective Harris that her father was on parole and in possession of an AK-47-style rifle and a handgun. Ms. Dono explained that she resided with the defendant and the defendant had asked Ms. Dono to conceal the rifle inside her closet.  Detective Harris followed up with an in person meeting with Ms. Dono on Friday, February 5, 2010.  At this meeting, Johnnille Dono confirmed the identity of her father, and expressed her desire not to cooperate any further for fear of

---

[1] The government also relied on United States v. Eggleston, 243 Fed. Appx. 715 (3d Cir. 2007), in which parole officers themselves had reasonable suspicion to suspect that the defendant had violated his parole.

2

reprisal. After this conversation, Detective Harris confirmed that Mr. Dono was currently on probation or parole under Pennsylvania supervision.

Detective Harris contacted Pennsylvania State Parole Agent Aileen Sabol and stated that he had received "an anonymous tip from an uncooperative individual" that there was one, if not two, firearms on Mr. Dono's property. (N.T. 7:22-25.) Detective Harris did not relate any of the other specifics of which he was aware to Agent Sabol, such as location of the weapon in the house, the relationship of the tipster to Mr. Dono, that he had met with the tipster in person, or circumstances surrounding the delivery of the weapon to Mr. Dono's home. Agent Sabol agreed that Detective Harris essentially said that he had received a tip that there may be a gun in the home with no other information.

Agent Sabol did not conduct any other investigation after receiving the tip from Detective Harris, nor did Detective Harris direct or instruct Agent Sabol to pursue the lead. Agent Sabol testified: "[Detective Harris] told me he had received an anonymous tip that Mr. Dono possibly had weapons in his house. And he was telling me, because he knows that we make our visits at home, so for safety purposes." (N.T. 44:16-19.) After receiving the tip, Agent Sabol consulted with Agent Edward McGuire, and decided to consult with her supervisor, David thorStraten-Mohr. The supervisor instructed the parole agents to

"wait for the weekend, to see if the police could develop any information." (N.T. 45:18-22.)[2] Before reaching the decision to search Mr. Dono's home, the parole agents reviewed Mr. Dono's criminal history. Agent Sabol described Mr. Dono's record as including at least one conviction in federal court and at least four convictions in state court, which included assaultive convictions and drug use. There had been no problems or issues with Mr. Dono during his supervision.

Without any additional information, the agents decided that, "in the interest of public safety and the safety of Mr. Dono's family, that [they] had to search the residence." (N.T. 45:23-46:9.) Agent Sabol then contacted Detective Harris to inform him that the parole agents planned to search Mr. Dono's home, and they requested that Detective Harris bring uniformed police officers to provide backup. Detective Harris was not involved in the decision to conduct a parole search of Mr. Dono's home.

On or about February 9, 2010, Agent Sabol and the state parole agents conducted a search of the house. Detective Harris and the uniformed police officers did not assist in the initial search. During the initial search, Detective Harris testified

---

[2] Detective Harris testified that he did not investigate the matter further because he believed that he had left the investigation in the hands of the state parole agents. (N.T. 25:6-9.)

4

that he remained outside of the house, and then waited in the kitchen after it became apparent that the defendant "wasn't going to create a problem[.]" (N.T. 28:17-20.) Agent Sabol recovered an AK-47 style rifle in the closet of Ms. Dono's bedroom. After the rifle was found, Detective Harris obtained a search warrant to search the rest of the house. The Newtown Township Police Department then took possession of the weapon. Following the seizure of the weapon, the defendant was transported from his residence to the Newtown Township Police Station. The defendant was read his Miranda rights and interviewed by Detective Harris and Agent Sabol.

As a condition of Dono's parole, Dono agreed to the search policy of the Pennsylvania Department of Probation and Parole that allows for warrantless searches. (See N.T. 42:24-43:6.)

II. Analysis

The United States Court of Appeals for the Third Circuit has concluded that parole officers acting pursuant to Pennsylvania's warrantless search condition must have reasonable suspicion in order to search the residence of a parolee. United States v. Baker, 221 F.3d 438, 440 (3d Cir. 2000). Reasonable suspicion is a "particularized and objective basis for suspecting the particular person . . . of criminal activity." United States

v. Brown, 448 F.3d 239, 246 (3d Cir. 2006). To decide whether "reasonable suspicion" exists, courts consider the totality of the circumstances. United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005). An anonymous tip, without more, does not provide reasonable suspicion. Florida v. J.L., 529 U.S. 266, 274 (2000) ("[W]e hold that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm."). Reasonable suspicion must be measured by what the officers knew before they conducted their search. Id. at 271.

In certain situations, the reasonable suspicion of one officer may be transferred to another officer under the "collective knowledge" doctrine. See, e.g., United States v. Hensley, 469 U.S. 221, 232 (1985) (holding that police officers in one jurisdiction may rely on a "wanted flyer" issued by another department where the issuing department had a reasonable basis for issuing the flyer and stop is made in objective reliance on the flyer); United States v. Burton, 288 F.3d 91, 99 (3d Cir. 2002) ("An officer can lawfully act solely on the basis of statements issued by fellow officers if the officers issuing the statements possessed the facts and circumstances necessary to support a finding of the requisite basis."); United States v. Colon, 250 F.3d 130, 136 (2d Cir. 2001) (declining to extend

collective knowledge doctrine where non-officer emergency dispatch possessed information sufficient for reasonable suspicion, but information was not conveyed to arresting officers).

The defendant has moved to suppress the gun that was found in his home on the grounds that the parole agents lacked reasonable suspicion to conduct the search. The analysis as to whether the parole agents' search was permissible under the Fourth Amendment involves three parts. As an initial matter, the Court addresses whether Detective Harris had reasonable suspicion to suspect that Mr. Dono was illegally in possession of a firearm. The Court then addresses whether Agent Harris had reasonable suspicion to conduct the search of Mr. Dono's home. Concluding that Detective Harris had reasonable suspicion, but Agent Sabol did not, the question before the Court is whether the information in Detective Harris's possession may be imputed to Agent Sabol.

A. <u>Detective Harris</u>

Detective Harris had at least reasonable suspicion to suspect that Mr. Dono was a felon in possession of a firearm. Johnnille Dono described the type of gun, specific information about where the gun was located, how the gun arrived, including such specific details as the gun was double-wrapped inside two

garbage bags in her bedroom closet.  After speaking on the phone with Ms. Dono, Detective Harris also met with Ms. Dono in person the next day to go over her story again.  Ms. Dono also identified a photo of her father.  This level of information easily creates a "particularized and objective basis for suspecting the particular person . . . of criminal activity." United States v. Brown, 448 F.3d 239, 246 (3d Cir. 2006) (citation and quotation omitted).

    B.    Agent Sabol

Agent Sabol, however, received what amounts to an anonymous tip, without more, from Detective Harris.  Agent Sabol testified that Detective Harris did not disclose any of the additional information that he learned to Agent Sabol.  The only other investigation that Agent Sabol conducted was to look at Mr. Dono's criminal history.  Dono's criminal history, however, provides no additional reason to suspect that he would be in possession of a firearm.  In addition, Agent Sabol testified that Mr. Dono had not had any problems of any kind while on probation. From Agent Sabol's perspective, Detective Harris simply passed along a message that he had received an anonymous tip that Mr. Dono may have weapons in his home.

        In Florida v. J.L., the Supreme Court addressed whether an anonymous tip, without more, can constitute reasonable

8

suspicion.  See Florida v. J.L., 529 U.S. 266, 274 (2000).  In J.L., an anonymous caller reported to the police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun.  There was no recording of the tip and nothing was known about the informant.  Police arrived on the seen, and saw three black males standing at the corner.  One of the three, J.L., was wearing a plaid shirt.  Apart from the tip, the officers had no reason to suspect any of the three of illegal conduct.  One of the officers approached J.L., told him to put his hands up on the bus stop, frisked him, and seized a gun from J.L.'s pocket.

In J.L., the Court concluded that the anonymous tip without predictive value lacked the indicia of reliability to support a finding of reasonable suspicion.  J.L., 529 U.S. at 274.  The Court distinguished the tip in J.L. from the anonymous tip in Alabama v. White.  See Alabama v. White, 496 U.S. 325, 327 (1990).  In White, the police received an anonymous tip asserting that a woman was carrying cocaine.  The tip predicted that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel.  The police were then able to observe these events actually happen.  The White Court observed that there are situations in which an anonymous tip, suitably corroborated, exhibits "sufficient indicia of reliability to provide reasonable

suspicion to make the investigatory stop." White, 496 U.S. at 327. The Court credited the predictive nature of the tip, but acknowledged the case as a borderline example of reasonable suspicion. Id. at 332. The J.L. Court observed that if White was a borderline case, then the bare anonymous tip in J.L. could not sustain reasonable suspicion. See J.L., 529 U.S. at 271 ("If White was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line.").

The J.L. Court also declined to create a "firearm" exception to the reliability analysis. J.L., 529 U.S. at 272. The Court held "that an anonymous tip lacking indicia of reliability of the kind contemplated in Adams and White does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm...." J.L., 529 U.S. at 274.

The Court concludes that the tip Agent Sabol received is more akin to the tip in J.L. than it is to the tip in White. The tip contained no indicia of reliability: it did not state the basis of knowledge of the tipper, any specific details that would evidence reliability, or anything else other than a bear bones tip that Mr. Dono may be in possession of a gun. The fact that the tip was relayed by a detective to Agent Sabol does not bolster the reliability of the tip because it appears from the record that Detective Harris did not even hint that the tip was anything more substantial than an anonymous tip with no

10

investigatory follow up.

### C. Collective Knowledge Doctrine

The question before the Court is whether Detective Harris's reasonable suspicion may be imputed to Agent Sabol and rehabilitate an otherwise impermissible search. Under the "collective knowledge doctrine," the knowledge of one law enforcement officer may be imputed to the officer who actually conducted the seizure, search, or arrest. United States v. Whitfield, --- F.3d ----, 2010 WL 5514771, at *3 (3d Cir. Dec. 6, 2010). The United States Court of Appeals for the Third Circuit has recently applied the collective knowledge doctrine to a Terry seizure requiring reasonable suspicion. See Whitfield, 2010 WL 5514771, at *4. The Court observed that the collective action doctrine sensibly applies where "the officers worked together as a unified and tight-knit team" in a "fast-paced, dynamic situation." Whitfield, 2010 WL 5514771, at *4. The United States Court of Appeals for the First Circuit has also explained that under the collective knowledge doctrine, "reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion." United States v. Am, 564 F.3d 25, 31 (1st Cir. 2009).

A common thread among cases that apply the collective

11

knowledge doctrine is the joint effort of the searching/arresting officers or the presence of an instruction to search from an officer or agency with sufficient knowledge. For example, in the United States v. Hensley, the Supreme Court addressed the situation where one police department issued a "wanted flyer" and a neighboring police department, acting in reliance on the flyer, made an investigatory stop of the subject's vehicle and found several handguns. United States v. Hensley, 469 U.S. 221, 223-26 (1985). The Supreme Court concluded that if the flyer is issued on the basis of reasonable suspicion, objective reliance on the flyer justifies a brief, investigatory stop.

> [I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification to pose questions to the person, or to detain the person briefly while attempting to obtain further information. . . . Assuming the police make a Terry stop in objective reliance on a flyer or bulletin, we hold that the evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop [] and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department.

Hensley, 469 U.S. at 232-33 (citations omitted). Likewise, in Whitfield, the Court of Appeals for the Third Circuit noted that the "officers worked together as a unified and tight-knit team . . . ." Whitfield, 2010 WL 5514771, at *4.

In United States v. Shareef, the United States Court of Appeals for the Tenth Circuit declined to extend the collective knowledge doctrine to a situation where the evidence showed officers had not in fact communicated with each other. United States v. Shareef, 100 F.3d 1491, 1504-505 (10th Cir. 1996). The Court observed:

> We can see the value in imputing knowledge among officers working closely together. . . . However, in this case, the presumption of communication is rebutted, because the district court found that in fact the information had not been shared. Even in the absence of evidence of communication among officers, however, when officers act collectively it may sometimes be appropriate to look to their collective knowledge in determining whether they behaved reasonably. For example, where two officers are working closely together at the scene and each has observed suspicious circumstances that the other has not observed, even absent evidence of communication between the officers, we might be willing to aggregate their knowledge in deciding whether they behaved reasonably. That is not the case here. . . .

Shareef, 100 F.3d at 1504 (footnote omitted). The Court of Appeals for the Tenth Circuit later distinguished Shareef in cases of "vertical" collective knowledge, i.e., where one officer has the requisite level of suspicion and instructs another officer to act, but does not communicate the information that would justify the action. See United States v. Chavez, 534 F.3d 1338, 1345-47 (10th Cir. 2008) ("[T]hose circuits that have addressed squarely the issue presented here have held that a

13

police officer may rely on the instructions of the DEA (or other law enforcement agencies) in stopping a car, even if that officer himself or herself is not privy to all the facts amounting to probable cause.").

In United States v. Am, the United States Court of Appeals for the First Circuit addressed reasonable suspicion to perform a Terry stop based on an individual's reputation, situational factors, and a detective's tip based on an anonymous interview that the subject was a suspect in a shooting. United States v. Am, 564 F.3d 25, 28 (1st Cir. 2009). In Am, a detective had informed one of the patrol officers, Sergeant Michael Vail, that the defendant was a suspect in a recent shooting based on an anonymous interview. Sgt. Vail also had personal knowledge that Am was a gang member and that Am had a reputation for carrying a weapon. Vail also had never before seen Am walking alone in a high-crime, rival gang territory and surmised that he would not do so without being armed. Id. Vail and Officer Michael Kmiec stopped Am, pat-frisked him, and found a gun in his pocket. Am moved to suppress the gun. The Court concluded that the officers possessed reasonable suspicion "even excluding the tip from Hogan[.]" Id. at 30.

Turning to the tip from Detective Hogan, the Court of Appeals explained that "reasonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the

14

<u>direction of another officer</u> who has reasonable suspicion." Id. at. 31 (emphasis added, quotation omitted). The Court noted that, for example, "Officer Kmiec was entitled to assume that Sergeant Vail, who had far greater familiarity with Am, was acting in a manner consistent with [his] legal responsibilities." Id. (citation and quotation omitted). The Court concluded that it would excise Detective Hogan's information from its analysis because the government had failed to provide information regarding the source of reliability of Hogan's tip. Id. at 32.

The United States Court of Appeals for the Second Circuit addressed a situation similar to this case where one person had information that constituted reasonable suspicion, but failed to relate that information to the dispatching or arresting officer. See United States v. Colon, 250 F.3d 130, 131 (2d Cir. 2001). The notable distinction between Colon and the facts of this case is that the emergency dispatcher was not a police officer. The Court of Appeals for the Second Circuit emphasized that a 911 operator is not trained in determining reasonable suspicion. See Colon, 250 F.3d at 137. However, in Colon, the Court of Appeals observed the importance that the officer "initiating the search or arrest" have the requisite level of suspicion:

> A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual

15

>     searching or arresting officers relied, had
>     information that would provide reasonable
>     suspicion or probable cause to search or
>     arrest the suspect.

Colon, 250 F.3d at 135-36.

The cases on which government relies in its supplemental opposition are distinguishable from the facts in this case. In Hensley, the police department that issued the wanted flyer would have been aware that its actions would be interpreted as a declaration that it possessed reasonable suspicion for issuing the flyer. The Supreme Court noted that if the flyer was issued without reasonable suspicion, then a stop in objective reliance of it would violate the Fourth Amendment — but the officers making the stop may have a good-faith defense to a civil suit. Hensley, 469 U.S. at 232. In contrast, a statement that one officer has received an anonymous tip without more would not suggest that the officer possesses reasonable suspicion. See Florida v. J.L., 529 U.S. 266, 274 (2000). It would not be objectively reasonable for the receiver of such information to presume that the statement was made by an officer who possessed reasonable suspicion.

In Chavez, a DEA task force officer instructed a New Mexico State Police patrolman to pull over a man who the DEA had reasonable suspicion to believe was in possession of cocain. United States v. Chavez, 534 F.3d 1338, 1340 (10th Cir. 2008). This case is distinguishable from "vertical" collective knowledge

16

cases like Chavez because there had been no instruction to search or objective indication that Detective Harris possessed the requisite level of suspicion for a parole officer to initiate a search.

Detective Harris represented that he received an anonymous tip. This fact would not lead a reasonable officer to conclude that Detective Harris possessed reasonable suspicion. Indeed, the record reflects that Agent Sabol and her colleagues came to this very conclusion. Agent Sabol testified that after receiving the information, her supervisor told her to wait and see if the police uncovered more information. This initial assessment indicates that the parole agents were aware that they did not have enough information to constitute reasonable suspicion.

In addition, Detective Harris's involvement in the search is not enough to rise to the level of working together as a team. Cf. Whitfield, 2010 WL 5514771, at *4; Am, 564 F.3d at 31. Detective Harris was not involved with the probation agents' decision to search Mr. Dono's home nor did he work closely with Agent Sabol in effecting the search. Detective Harris was present at the search, but only to provide back up. Only after the parole agents recovered the weapon did Detective Harris take an active role in the search and investigation.

III. Conclusion

Because the Pennsylvania parole officers lacked reasonable suspicion to search the defendant's home for a weapon, the search was unconstitutional and the weapon must be suppressed. Under the fruit of the poisonous tree doctrine, the subsequent custodial statements are tied to the weapon itself. Accordingly, the defendant's motion is granted.

An appropriate Order shall issue separately.